52 A.3d 946

**Tonto CORBIN**

v.

**STATE of Maryland.**

**No. 48, Sept. Term, 2011.**

Court of Appeals of Maryland.

Aug. 22, 2012.

Reconsideration Denied Oct. 18, 2012.

Stephen B. Mercer, Chief Attorney (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and ALAN M. WILNER, (Retired, Specially Assigned), JJ.

ADKINS, J.

We again examine the evolving law regarding the scope of Fourth Amendment protections in the context of the collection and analysis of DNA by police. Unlike in earlier Maryland cases, the Maryland DNA Collection Act does not apply here because Petitioner Tonto Corbin was not arrested for any of the Act's predicate offenses.[1] Rather, Corbin was on probation for a drunken driving offense when his DNA was collected. The DNA was taken from saliva that Corbin left on a straw in the course of complying with an alcohol monitoring program mandated by the terms of his probation. Corbin challenges the use of that saliva in connection with a separate murder investigation that resulted in incriminating evidence against him.

---

**1.** *See King v. State,* 425 Md. 550, 555, 42 A.3d 549, 552 (2012) ("[The] Maryland DNA Collection Act ... purports to authorize State and local law enforcement authorities to collect DNA samples from individuals who are arrested for a crime of violence, an attempted crime of violence, a burglary, or an attempted burglary. Maryland Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(a)(3).").

The trial court denied Corbin's motion to suppress the DNA evidence on Fourth Amendment grounds. The State then introduced the DNA and lab report into evidence to prove his connection to the homicide, and he was convicted of involuntary manslaughter. Corbin appealed to the Court of Special Appeals. That court, in an unreported opinion, rejected his claim that the seizure of his DNA without a warrant violated the Fourth Amendment, ruling instead that Corbin did not have a reasonable expectation of privacy in either the testing straw or the DNA on it.

We granted *certiorari* to address the following questions, as Corbin phrased them:

1. Does a DWI probationer, who had previously declined police requests to seize and test his DNA, voluntarily surrender his breath for DNA testing where State officers seize his DNA on the false pretense of seizing and testing only his blood alcohol?

2. In an entirely circumstantial case, was the evidence of Petitioner's criminal agency legally insufficient because the State failed to establish that it was any stronger than evidence implicating two or three other suspects?

We shall hold that Corbin's Fourth Amendment rights were not violated when the State recovered his DNA from the straw utilized for this mandatory test. We shall also hold that the evidence was sufficient to sustain Corbin's conviction.[2]

### Statement of Facts and Legal Proceedings

In December 1995, Jacqueline Tilghman's body was discovered near a farm road in Somerset County. The investigation

---

2. The State argues that we should decline to reach the constitutional questions raised by Corbin because of the independent source doctrine. After leaving his DNA on the testing straw, Corbin pleaded guilty to and was convicted of second-degree rape, which required him to provide a DNA sample for a Maryland database pursuant to Maryland Code (2003, 2011 Repl.Vol.), Section 2–504(a) of the Public Safety Article. Thus, the State argues that "[e]ven without testing the straw, the police would have obtained Corbin's DNA[.]" Because of our holding, however, we need not address this argument.

concluded that the cause of her death was homicide, committed where she was found. Semen was found on vaginal and anal swabs taken of the victim. DNA samples obtained from the swabs were turned over to the Maryland State Police crime laboratory for further testing and storage.

The investigation into her death continued into 2001, at which point Corbin was identified as an associate of the victim. Investigators asked Corbin to voluntarily submit a DNA sample, but he declined. Investigators discovered that Corbin was on probation for a DWI conviction and therefore subject to court-ordered breath tests for alcohol consumption. One testing method is a "deep lung" test, requiring the probationer to blow into a straw. Upon learning that the straw would be discarded following the test, investigators arranged with Corbin's probation officer to secure the straw after he had completed this test.

Once obtained, the straw was sent to the crime lab for DNA analysis. The crime lab matched Corbin's DNA on the straw to DNA in the semen recovered from the vaginal and anal swabs of the victim taken earlier in the homicide investigation. Based on the match, police obtained a warrant for another DNA sample from Corbin, which confirmed the match. It was the second DNA sample that, ultimately, was admitted into evidence against Corbin over the defense objection.

In 2004, Corbin was indicted for murder.[3] Before trial, Corbin filed a motion to suppress the DNA evidence on the grounds that the seizure of his DNA by the State without a warrant violated his rights under the Fourth Amendment. The State argued that there was no Fourth Amendment violation because Corbin was on probation, the terms of which required him to submit to the breath test from which the DNA was extracted. Corbin's motion was denied by Judge Daniel M. Long of the Circuit Court for Somerset County, who explained:

---

3. Corbin was also charged with first- and second-degree rape, but the State entered a *nolle prosequi* to those counts.

The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined ... by assessing on the one hand the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interest.

With respect to those persons on probation, however, it has been held inherent in the very nature of probation ... that probationers do not enjoy the absolute liberty to which every citizen is entitled.

[A] case ... out of the Third Circuit, U.S. v[.] Sczubelek ... involved the taking of a DNA sample from a probationer. And although not directly on point there was mention that probationers do not enjoy the same liberties that ordinary citizens enjoy. The court noted in its opinion that probation officers have a special need to supervise probationers apart from a normal law enforcement need that justifies a departure from the normal warrant and probable cause requirements.

This Court therefore[,] in balancing the privacy rights of the defendant against legitimate interests of the state, is not persuaded that the DNA sample taken from the breath tube or breath straw obtained from the defendant through the efforts of his probation agent violates his Fourth Amendment rights under the constitution.

After Corbin waived his right to a trial by jury, the parties submitted the case to the Circuit Court on an agreed statement of facts, and Judge Long found Corbin guilty of involuntary manslaughter. The judge sentenced Corbin to ten years' imprisonment, with all but eight years suspended, and two years supervised probation.

The statement of facts was read into the record as follows:

The evidence in this case would show that, at approximately 7:20 a.m. on the morning of December 27th, 1995, the body of [the victim], a thirty-two-year-old black female, was found by Ronald and Elwood Hall while the Halls were checking their muskrat traps on their farm located on

Marumsco Road, one mile West of Cornstack Road in Marion, Somerset County, Maryland.

The victim was found [lying] on her back with her head tilted to the right. Her entire head and shoulder area were covered with blood. The front and left side of her head was severely injured. Her right arm was down to her left side. She had gloves on both hands. A blood-soaked white [sweatshirt] was on the upper body and was pushed up, exposing her breast. Her bra was also pushed up over her breast. A pair of white panties, white [sweatpants], and black jeans were all down around her ankle on the right leg. A large abrasion and bruise was obvious to the middle of the victim's chest.

The ground ... around the victim's head and upper body was saturated with blood. The surrounding tall grass vegetation was splattered with blood as far as eleven feet south of the victim and extending toward the ditch that parallels Marumsco Road. Blood spatter was also found from the body to the center of the dirt lane, in as high as six feet on tall grass vegetation surrounding the victim to approximate[ly] eight inches in diameter. Blood soaked areas were on the ground and grass next to the east side of the lane by the victim. These facts indicate that the crime occurred at this location.

An autopsy was subsequently performed at the office of the medical examiner for the State of Maryland by Doctor Locke of that office. Doctor Locke would testify that the victim died of strangulation and blunt force injuries to the head. The pattern of injuries to the external and internal structures of the neck [was] most consistent with a manual-type strangulation. The pattern of blunt force injuries to the left side of the face and temple region were consistent with the deceased having received a minimum of five to six blows to that area by a hard, blunt object. The manner of death was homicide.

Evidence was collected from the victim at the scene and sent to the Maryland State Police crime lab for analysis. The results of that analysis would show that [Corbin's] DNA

profile was found on the vaginal and anal swabs of the victim. No other DNA profile other than the victim['s] was found on those swabs. Wesley Phillips'[s] DNA profile was found in the underpants—the crotch of the underpants of the victim and in the crotch of the [sweatpants] of the victim. There was also possibly another partial DNA profile on the underpants. That profile was not identified, but [Corbin] was excluded [as] a source of that profile. There was an unidentified source on the crotch of the victim's jeans.

Witnesses would testify that the victim was with Wesley Phillips earlier in the evening on December 27th of 1995.

The State would present two expert witnesses in the case: Argi Magers, who is a forensic chemist for the Maryland State Police crime lab, as well as Dr. Locke, who is a medical examiner for the State of Maryland.

The State would seek testimony from those witnesses that the victim never stood up after intercourse because there was no evidence that [Corbin's] semen had drained on to any of the victim's clothing. The State's experts would testify that the absence of [Corbin's] semen on the victim's clothing was consistent with the victim not standing up after intercourse. And they would testify that the underwear and clothing would be a likely place to look for drainage of semen. However, the defense would offer two experts also: Elizabeth Johnson, who is a forensic biologist and evidence analyst, as well as Doctor Gill, who is a medical examiner. And they would testify, and the State's experts would agree, that this drainage theory could not be supported by an opinion of reasonable medical or scientific certainty because of other variables that could enter into the drainage possibilities. Additionally, Doctor Locke would testify that the sex and the death could not be forensically linked.

During this investigation, [Corbin] was contacted in 1998 by Corporal McQueeny of the Maryland State Police. At that time, [Corbin] denied having any sexual contact with the victim for years prior to her death. [Corbin] was again contacted by Sergeant McCauley of the Maryland State

Police in 2000. [Corbin] again denied having any contact with the victim for years prior to her death.

Approximately one hundred witnesses were interviewed during this investigation. And although an exact [timeline] could not be established, the evidence would show that the last witness to see the victim alive saw the victim at approximately 1:30 a.m. on the 27th, wearing the same clothing that she was found in.

Gladys Johnson, who is [Corbin's] aunt, would testify that [Corbin] told her that he had had sex with the victim between 2:00 and 3:00 a.m. on December 27th of 1995.

These events occurred in Somerset County, Maryland. And [Corbin] is the defendant seated at defense table next to defense counsel in an orange jumpsuit. (Punctuation added.)

Corbin appealed to the Court of Special Appeals, challenging the denial of his motion to suppress the DNA results, and claiming that the evidence was legally insufficient to support his conviction. In an unreported opinion, the intermediate appellate court rejected his Fourth Amendment claim, relying on our decision in *Williamson v. State*, 413 Md. 521, 538, 993 A.2d 626, 636 (2010), to hold that Corbin did not have an expectation of privacy in either the straw or the DNA obtained from it. The court also held that a rational trier of fact could conclude that Corbin was guilty of involuntary manslaughter beyond a reasonable doubt.

We granted *certiorari* on both issues, *see Corbin v. State*, 420 Md. 463, 23 A.3d 895 (2011), and shall affirm the judgment of the Court of Special Appeals.

### Discussion

### I. DNA

As we said in *Williamson*:

When we review a trial court's grant or denial of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment, we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party

that prevailed on the motion. We defer to the trial court's fact-finding at the suppression hearing, unless the trial court's findings were clearly erroneous. Nevertheless, we review the ultimate question of constitutionality de novo and must "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." (Citations omitted.)

*Williamson,* 413 Md. at 531–32, 993 A.2d at 632.

The parties have devoted much of their argument to abandonment. The State's argument on this ground is that Corbin abandoned the straw because he "made no effort to gain possession of the straw after the test was administered." If Corbin is deemed to have abandoned the DNA on the straw, then the Fourth Amendment would not apply. As we said in *Stanberry v. State,*

Fourth Amendment protection . . . does not extend to property that is abandoned. By abandoning property, the owner relinquishes the legitimate expectation of privacy that triggers Fourth Amendment protection. (Citations omitted.)

*Stanberry v. State,* 343 Md. 720, 731, 684 A.2d 823, 828–29 (1996).

In *Williamson,* a suspect was arrested and, while he was in jail, investigators brought him a meal from McDonald's; the DNA from his discarded McDonald's cup was ultimately used to convict him on another matter. *See Williamson,* 413 Md. at 524, 527–28, 993 A.2d at 628, 630. In that case, the suspect had accepted the investigators' offer of food and thrown the wrappers and cup on the floor of his jail cell. *Id.* at 536, 993 A.2d at 635. By doing so, we held, he abandoned the refuse, and the seizure of DNA was constitutional. *Id.* at 533–37, 993 A.2d at 633–635.

■ We reaffirm the holding in *Williamson,* but we conclude that the abandonment theory utilized there is not applicable here. Realistically, Corbin had no option to retain the straw as his own or protect his DNA from being taken. While in *Williamson,* the suspect was offered McDonald's food and voluntarily accepted, Corbin here was taking an alcohol monitoring test, mandated by his probation officer while on proba-

tion for a drunk driving offense. We do not subscribe to the notion that the Fourth Amendment is not applicable because Corbin *voluntarily* ceded a privacy interest in his saliva and the straw by failing to make an effort to "gain possession" of the State-owned and State-administered testing apparatus, from which his DNA was extracted.[4]

Instead, the Fourth Amendment applies and governs this case. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment applies to Maryland through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); *Owens v. State*, 322 Md. 616, 622, 589 A.2d 59, 61 (1991).

Under the Fourth Amendment, Corbin has the burden of demonstrating that he has a legitimate expectation of privacy in the material to be seized. Case law requires that a "person claiming protection under the Fourth Amendment demonstrate an actual (subjective) expectation of privacy in the item or place searched, as well as prove that the expectation is one that society is prepared to recognize as reasonable." *See, e.g., Williamson*, 413 Md. at 534, 993 A.2d. at 634.[5]

Undoubtedly, the collection of blood for DNA profiling constitutes a search for Fourth Amendment purposes.

---

**4.** Corbin's agreement to the terms of his probation order included consent to the regular alcohol monitoring/testing, but it cannot be said to be a waiver of all of his Fourth Amendment rights with respect to such testing. *See United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001) (leaving unanswered the question of whether a probationer waives all Fourth Amendment rights pursuant to a search condition of his probation).

**5.** This principle was articulated by Justice Harlan in his concurring opinion in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516,

*Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989) ("Obtaining and examining the evidence may also be a search, if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable[.]" (citations omitted)). Collection of a person's DNA by use of a buccal swab is also subject to Fourth Amendment standards, but is less intrusive than a blood test. *See King,* 425 Md. at 555–56, 42 A.3d at 552–53 (observing that swabbing the inside of a suspect's mouth is a search); *State v. Raines,* 383 Md. 1, 17–19, 857 A.2d 19, 29 (2004) (describing the invasion of a buccal swab to be "minimal at most").

Corbin's claim is subject to the two-part rubric articulated in *Williamson:* Did he have an actual expectation of privacy in his DNA, and if so, is society prepared to recognize that expectation as reasonable? We assume his actual or subjective expectation of privacy without discussion, and proceed to the question of whether, as a probationer subject to mandatory alcohol testing, Corbin had a **reasonable** expectation of privacy in his DNA left on the straw after such a test. The Supreme Court, in *United States v. Knights,* 534 U.S. 112, 118–19, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001), provides the framework for evaluating a probationer's privacy expectations in this context.

Knights was sentenced to probation for a drug offense. "The probation order included the following condition: that Knights would submit his … person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114, 122 S.Ct. at 589 (quotation marks omitted).[6]

---

19 L.Ed.2d 576 (1967) (Harlan, J., concurring), and adopted by this Court in *Venner v. State,* 279 Md. 47, 51–52, 59, 367 A.2d 949, 952, 956 (1977).

**6.** Here, the record does not contain Corbin's probation order, but it is undisputed that mandatory alcohol testing was a part of his probation.

Knights agreed to the terms of the probation order.  *Id.*
Three days later, a public utility telecommunications vault was
pried open and set on fire—the latest of a series of thirty acts
of vandalism against the public utility.  *Id.* Shortly before the
incidents, the company had filed a "theft-of-services com-
plaint" against Knights for failure to pay his utility bill and
discontinued his utility service.  *Id.* at 114–15, 122 S.Ct. at
589.

The police, in a surveillance operation, observed a friend of
Knights leave Knights's apartment at 3:10 a.m., with cylindri-
cal items that looked like "pipe bombs," and walk to a nearby
river, where he dumped them in the water.  *Id.* at 115, 122
S.Ct. at 589.  Police then observed a number of suspicious
objects in this friend's truck:  a Molotov cocktail and explosive
materials, a gasoline can, and two brass padlocks that fit the
description of those removed from the PG & E transformer
vault.  *Id.* Based on these facts and knowing that Knights was
on probation, police entered and searched Knights's apartment
without a warrant.  *Id.* Inside, they found extensive items
incriminating Knights, which later became the subject of a
suppression hearing.  *Id.* at 115–16, 122 S.Ct. at 589–90.  The
District Court granted the motion to suppress on the ground
that the search was for "investigatory" rather than "probation-
ary" purposes, a decision that was affirmed by the Ninth
Circuit Court of Appeals.  *Id.*

The Supreme Court considered Knights's probation and also
confronted the question of whether the search must relate to
the person's probationary status:

> Certainly nothing in the condition of probation suggests that
> it was confined to searches bearing upon probationary sta-
> tus and nothing more.  The search condition provides that
> Knights will submit to a search "by any probation officer or
> law enforcement officer" and does not mention anything
> about purpose.  The question then is whether the Fourth
> Amendment limits searches pursuant to this probation con-
> dition to those with a "probationary" purpose.  (Citation
> omitted.)

*Id.* at 116, 122 S.Ct. at 590. The Court impliedly answered this question in the negative by concluding that, when there was reasonable suspicion that a probationer committed a crime, even though unrelated to his probation, police could search the probationer's home, despite the absence of probable cause or a search warrant. *Id.* at 117–20, 122 S.Ct. at 590–92.

The Supreme Court concluded that probationers have diminished expectations of privacy, discussing at length the inherent policy concerns in such cases:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests. Knights's status as a probationer subject to a search condition informs both sides of that balance. Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty. Probation is one point ... on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service. Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens. (Citations and quotation marks omitted.)

*Id.* at 119, 122 S.Ct. at 591.

The Court declined to adopt the government's theory that when Knights agreed to such searches as an explicit condition of his probation, he had waived his Fourth Amendment rights.[7] *Id.* at 118, 122 S.Ct. at 591. Instead, the Court preferred a "totality of the circumstances" analysis:

---

**7.** The Court held that the search of Petitioner's home, based on reasonable suspicion, was acceptable because, under the terms of his proba-

In the Government's view, Knights's acceptance of the search condition was voluntary because he had the option of rejecting probation and going to prison instead, which the Government argues is analogous to the voluntary decision defendants often make to waive their right to a trial and accept a plea bargain.

We need not decide whether Knights's acceptance of the search condition constituted consent in the ... sense of a complete waiver of his Fourth Amendment rights, however, because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach of "examining the totality of the circumstances," *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), with the probation search condition being a salient circumstance.

*Id.*

The Court emphasized the government's legitimate concerns about the conduct of probationers:

In assessing the governmental interest ... it must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law. The recidivism rate of probationers is significantly higher than the general crime rate. And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply[.]

(Citations and quotation marks omitted.)

---

tion, "the balance of [policy] considerations requires no more than reasonable suspicion" to conduct such a search. *Id.* at 121, 122 S.Ct. at 592

*Id.* at 120, 122 S.Ct. at 592. In the Court's view, we must be dual-minded when assessing probationers:

> The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. [The Ninth Circuit Court of Appeals] in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen. (Citations and quotation marks omitted.)

*Id.* at 120–21, 122 S.Ct. at 592.

■ *Knights* instructs us, then, that probationers do not enjoy the same liberty rights as other citizens and have fewer legitimate expectations about privacy than law-abiding citizens. We acknowledged this limitation in *King,* our most recent case involving police collection of DNA. *See generally King,* 425 Md. at 563–65, 42 A.3d at 557–58. There, we examined DNA collected via a buccal swab of a person who had been arrested, but not convicted, and who was not on probation. *Id.* at 593–94, 42 A.3d at 575–76. We held that such collection was a violation of the person's Fourth Amendment constitutional rights because he was a "mere arrestee," as compared to a convicted felon. *Id.* at 594, 42 A.3d at 576 ("As we held in *Raines,* once a person has been adjudicated lawfully to be a felon, his or her expectation of privacy is 'severely reduced' and the State's interest prevails in monitoring, identifying, reintegrating, and preventing recidivism by the felon."). Judge Harrell, writing for the Court, was careful to delineate the boundaries of our holding: "The State here can not claim the same public safety interests present in cases addressing convicted felons, parolees, or probationers." *Id.* at 598, 42 A.3d at 578.

In *Samson v. California,* 547 U.S. 843, 846, 126 S.Ct. 2193, 2196, 165 L.Ed.2d 250 (2006), the Supreme Court reviewed a California law requiring every prisoner released on parole to be subject to a search or seizure by a parole officer or other peace officer at any time, with or without a warrant or probable cause. Extending its ruling in *Knights,* the Court held that, with respect to an individual on parole from his prison sentence, "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857, 126 S.Ct. at 2202 (internal quotation marks omitted). Samson was on parole "following a conviction for being a felon in possession of a firearm[,]" *Id.* at 846, 126 S.Ct. at 2196, and the Court focused on that status, finding it a more restricted status than probation:

As we noted in *Knights,* parolees are on the "continuum" of state-imposed punishments. On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this Court has pointed out, parole is an established variation on imprisonment of convicted criminals.... The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence. In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements. (Citations and quotation marks omitted.)

*Id.* at 850, 126 S.Ct. at 2198.

Two questions unanswered by the Supreme Court or this Court in DNA collection cases are pertinent here. First, how should the principles of *Knights* be applied when the defendant is on restricted release from a misdemeanor, rather than from a felony, as in both *Knights* and *Samson*? Second, how much weight should we give to the fact that Corbin's DNA was *collected* pursuant to a probation order requiring submission to drug or alcohol monitoring, when we consider Corbin's Fourth Amendment privacy interests with regard to the *retention and use* of his DNA to investigate other crimes? We

need not decide these questions in a vacuum. Rather, we shall consider them in the context of applying the *Knights* totality of the circumstances test to determine whether the search conducted in this case was reasonable. *See Knights*, 534 U.S. at 118, 122 S.Ct. at 591.[8] We first consider the interests of the State.

## A. Interests of the State

We start with the recognition, favorable to the State, that this was not a suspicionless search like the one the Supreme Court considered in *Samson*. In 2000, Sgt. McCauley was assigned to take over the homicide investigation respecting the 1995 death of Jacqueline Tilghman. At that point, although extensive investigation had been done, no arrest had been made. McCauley testified at the suppression hearing that he began his investigation by reading the reports written by the original investigator. By doing so, he learned the names of several people who "had contact with the victim during that period of time[.]" The victim had engaged in prostitution, and in some cases the phrase "had contact" clearly referred to having sexual relations with the victim.

McCauley decided that he would seek DNA samples from these people, to compare against semen found on the victim and in her clothing. After securing consent and receiving test results from all except Corbin, he learned that none of their DNA matched the DNA from the semen found on the victim. With Corbin still on his list of potential suspects, McCauley next did a background check and learned that Corbin was on probation for a DWI offense.

In a nutshell, we know that before McCauley approached Corbin's probation officer in February 2001, he had information to suggest that Corbin knew the victim. Furthermore, of

---

**8.** We do not take on the question of whether the rule in *Samson v. California*, 547 U.S. 843, 846, 126 S.Ct. 2193, 2196, 165 L.Ed.2d 250 (2006), allowing searches of parolees, could be applied to a probationer.

the people identified as associates of the victim,[9] Corbin was the only one whose DNA had not been tested. McCauley had other suspicious information about Corbin as well. McCauley testified at the suppression hearing that the first thing he did upon taking over the investigation was to read the entire investigation file, covering police work done over approximately five years. Information gleaned from that file included a report from a third party that the victim "did not get along with Tonto Corbin, because she refused to get involved with him;" that Corbin had been seen with the victim and another person on the day of her death; and that Corbin, when arrested on an unrelated crime, "reluctantly stated he had intimate contact" with the victim but that "it was a mistake that occurred a long time ago" and that he had not "had any intimate contact with the victim for years preceding her death." [10]

■ We conclude that all of these facts, taken together, are sufficient to establish reasonable suspicion, as required in *Knights. See also United States v. Midgette*, 478 F.3d 616, 625 (4th Cir.2007) ("Reasonable suspicion may be based simply upon a tip that has 'some particular indicia of reliability.' ... [In another case,] a tip received by a detective that 'there were or might be guns in [the probationer's] apartment' provided the probation officer with reasonable suspicion." (citing *United States v. Perkins*, 363 F.3d 317, 324–26 (4th Cir.2004); *Griffin v. Wisconsin*, 483 U.S. 868, 871, 107 S.Ct. 3164, 3167, 97 L.Ed.2d 709 (1987))); *United States v. Hagenow*, 423 F.3d 638, 642–43 (7th Cir.2005) (holding that police had reasonable suspicion when they received tip from a confidential informant that a probationer had guns in his home);

---

9. In his affidavit in support of the eventual search warrant for Corbin's person, McCauley mentioned having received DNA samples from nine men. During the suppression hearing, he said "there were approximately twelve."

10. The Application/Affidavit for a Search Warrant that McCauley prepared after he received Corbin's DNA sets forth many of the suspicious facts that he had learned, as stated above.

*United States v. Keith,* 375 F.3d 346, 350–51 (5th Cir.2004) (applying *Knights* to hold that probationer could be searched based on reasonable suspicion, even though no condition of probation existed that expressly allowed search); *State v. Anderson,* 733 N.W.2d 128 (Minn.2007) (upholding the search of probationer's home based on double hearsay information given by telephone to a police officer from a person the officer did not know, who said that her daughter knew probationer and that he had guns; holding it is " 'reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search' " (quoting *Griffin,* 483 U.S. at 879–80, 107 S.Ct. at 3171–72)).

The trial court considered Corbin's status as a probationer to be significant to the balance between Corbin's rights and the State's interests, and we agree. As the Supreme Court has established, the State has a heightened interest in probationers with regard to "recidivism, public safety, and reintegration[.]" *Samson,* 547 U.S. at 855 n. 4, 126 S.Ct. at 2201 n. 4. The Supreme Court said in *Knights* that " 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' " *Knights,* 534 U.S. at 120, 122 S.Ct. at 592 (quoting *Griffin,* 483 U.S. at 880, 107 S.Ct. at 3172).

As we indicated above, both *Knights* and *Samson* involved defendants on probation from felony offenses, and it was clear that the Supreme Court and this Court focused only on felony probationers. Although the record does not contain the verdict against Corbin for the DWI, we assume that Corbin was convicted of a misdemeanor. *See* Md.Code (1977, 2009 Repl. Vol., 2011 Cum.Supp.), § 27–101(a) of the Transportation Article ("It is a misdemeanor for any person to violate any of the provisions of the Maryland Vehicle Law unless the violation: (1) Is declared to be a felony by the Maryland Vehicle Law or by any other law of this State; or (2) Is punishable by a civil penalty under the applicable provision of the Maryland Vehicle Law."). We have no information to suggest that Corbin's

underlying DWI offense was a felony or was punishable only by a civil penalty.

Yet this misdemeanor offense, unlike many misdemeanors, carries the potential for significant jail time. Drunken driving carries the allowable penalty of imprisonment for up to one year (first offense), two years (second offense) or three years (third offense). *See generally* § 27–101(k)(1) of the Transportation Article. Moreover, we consider the serious nature of a drunk driving offense. According to the Maryland Task Force to Combat Driving under the Influence of Drugs and Alcohol ("Task Force"), "an average of 220 people died annually as a result of impaired-driving-related crashes on Maryland roads between 2004 and 2007." *See* Md. Task Force to Combat Driving under the Influence of Drugs and Alcohol, *Findings and Recommendations* 1–2 (October 2008). This equates to eighteen deaths each month, or a death every 40 hours, and such impaired-driving-related crashes make up approximately 40 percent of all traffic crashes in Maryland. *See id.* As the National Highway Traffic Safety Administration explains, "impaired driving can be defined as a reduction in the performance of critical driving tasks due to the effects of alcohol or other drugs. It is a serious crime that kills [nationally] every 30 minutes." *Id.* at 1–1.

Drunken driving also has a high rate of recidivism. *See id.* at 3–44 ("An increasing number of [DWI] arrests are repeat offenders. It is important that repeat offenders be effectively identified so that appropriate sanctions, assessment, and treatment can be provided to reduce [the] risk of repeated offenses."); *cf.* Section 27–101(k)(1) of the Transportation Article (providing increased penalties for repeat offenders). Although a chronic DWI offender may not intend to commit injury when he undertakes to drive while impaired, injuries and fatalities still occur, and the State's interest in monitoring such conduct is as great as if the injuries were intended. Thus, it is fair to say that the Supreme Court's rationale for increased control over probationers applies here as well.

For these reasons, we hold that a person on probation from a drunken driving offense has, like the probationer in *Knights,* a significantly diminished expectation of privacy.[11] Moreover, a probationer's expectation of privacy is diminished even when the new crime under investigation is not related to the crime that led to the probation sentence. *See Knights,* 534 U.S. at 117–18, 122 S.Ct. at 590–91. Accordingly, that Corbin's probation stems from a drunken driving offense does not proscribe applying the *Knights* "diminished expectation" rationale to a murder investigation.

## B. Corbin's Privacy Interests

We now shift our focus to examine Corbin's rights and legitimate expectations. First, we consider the distinction Corbin suggests between the breath test ordinarily used to detect alcohol and the test used in this case:

> The breath test ordinarily used to detect alcohol would have required Mr. Corbin to only blow into a cup-like device placed over his mouth. The "deep-lung" test required Mr. Corbin to place a straw in his mouth, create a tight seal around it with his lips, and blow.

We are not persuaded that this difference is material. Corbin did not object to parting with his saliva. As far as he was aware, the purported invasion of privacy was no different than what he endured every month as required by the terms of his probation. We see no greater invasion of privacy just because one must exert his facial muscles a little extra to perform the "deep-lung" test.

We do not ignore the more profound notion that Corbin's privacy is implicated not only by submission to the breathalyzer, but also by the entry of the profile into CODIS, the national DNA database. *See Skinner,* 489 U.S. at 616, 109 S.Ct. at 1413 ("The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested

---

11. To be sure, a probationer convicted of a lesser misdemeanor carrying a minimal prison sentence might be viewed differently.

employee's privacy interests."). In his brief, Corbin eloquently narrates the potential for seismic changes in an individual's relationship with government and loss of privacy that may arise as police take advantage of scientific advances in the field of cellular biology.[12] We share concerns about these unsettling scenarios posited by Corbin. Even so, we must balance our concerns for individual privacy with the legitimate needs of the State, and we must draw lines, an often exacting chore, reaching imperfect results.

### C. Balancing

Based on the Supreme Court holdings in *Knights* and *Samson*, and our own precedent, we conclude that the circumstances presented here fall on the State's side of the balance. It is a key factor that Corbin's DNA was collected during his regular, probation-mandated testing for alcohol abuse. The reasonable suspicions generated by the police's investigation of the murder further tilt this factor in the State's favor. Unlike the Petitioner in *King*, Corbin forfeited much of his right to privacy, if only for a limited time, by accepting probation for his earlier crime. Even if we were to consider the entry of Corbin's legally obtained DNA into CODIS as a second search, the larger concerns for privacy presented in Corbin's brief are not manifested in this case because such entry occurred, and the match was found, while he was still on probation. We see nothing in Fourth Amendment jurisprudence that allots a probationer a privacy interest that would prevent law enforcement, *during* the period of probation, from testing his legally collected DNA against the CODIS. *Compare generally United States v. Davis*, 657 F.Supp.2d 630 (D.Md.2009) (police legally obtained DNA from defendant's hospital visit, but violated the Fourth Amendment by retaining the DNA profile in a database for use years later).[13]

---

12. Corbin alerts us to the possibility that such advances could make discoverable ever-broader information about an individual's medical condition, familial connections, race, ethnicity, and gender.

13. Although the *Davis* court found a constitutional violation, it did not suppress the evidence, reasoning that the deterrent effect on police

Other privacy questions will remain for another day. We do not decide, for example, how long Corbin's DNA may remain in CODIS, especially if State law is modified to allow use of DNA for purposes other than merely creating an identifying profile, or if scientific advances make it feasible to extract predictive genetic information from the "junk" DNA already gathered. *See, e.g., King,* 425 Md. at 568 n. 17, 42 A.3d at 560 n. 17 ("There is . . . considerable current debate as to whether these 'non-coding' or 'junk' DNA provide no predictive genetic information.") (citing Simon A. Cole, *Is the 'Junk' DNA Designation Bunk?,* 102 Nw. U.L.Rev. 54, 54 (2007)); *United States v. Weikert,* 504 F.3d 1, 12–13 (1st Cir.2007) ("[W]e agree that, should the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary. However, on the record before us, the possibility that junk DNA may not be junk DNA some day also does not significantly augment [the] privacy interest in the present case." (citation and quotation marks omitted)).

In sum, Corbin expected to submit to a breath test, and he did so at the ordinary time and place called for by his probation schedule. McCauley waited approximately a month for Corbin to come in for customary alcohol monitoring by his probation agent. We reject out of hand Corbin's argument that "the only governmental interest assert[ed] was to evade judicial scrutiny." He rests this theory on McCauley's testimony that he surreptitiously collected Corbin's DNA because he did not want to "tip [his] hand" by obtaining a search warrant. That the State has a heightened interest in a

misconduct, to be achieved by suppression, was outweighed by the costs of suppressing "powerfully inculpatory and reliable DNA evidence." *United States v. Davis,* 657 F.Supp.2d 630, 666 (D.Md.2009) ("The marginal deterrence that might be achieved by suppression of the evidence in this case—potentially preventing police from placing DNA profiles obtained from those with undiminished privacy expectations in their genetic information (already a rare occurrence) into law enforcement databases—simply cannot justify keeping the DNA evidence from the jury and disrupting the truth-seeking function of a criminal trial.").

probationer has been firmly established by the Supreme Court in *Knights* and *Samson,* and nothing McCauley said or failed to say in answer to that particular question detracts from that interest. Indeed, the Supreme Court in *Knights* found legitimate a warrantless surprise search of a probationer's home. Surely, Knights's expectation of privacy in his home was greater than Corbin's expectation of privacy in a straw that the State supplied for use in its fully legitimate monitoring of Corbin's alcohol consumption, and that was never in Corbin's possession.

Accordingly, Corbin cannot meet the two-part test for a legitimate privacy interest outlined in *Williamson* and our other cases. *See Williamson,* 413 Md. at 534, 993 A.2d at 634; *Venner v. State,* 279 Md. 47, 51–52, 367 A.2d 949, 952 (1977). Corbin's claim fails, and we affirm the trial court's denial of his motion to suppress the DNA evidence connecting him to the crime.

## *II. Sufficiency of the Evidence*

Corbin also challenges the sufficiency of the evidence against him. The trial court convicted Corbin of involuntary manslaughter, and the conclusion that Corbin "was present at the time of the death of the victim" was a foundation of the conviction. Corbin attacks this portion of the trial court's conclusion, arguing that it "lacks reasonable support in the statement of facts." [14]

---

**14.** Corbin was convicted of involuntary manslaughter. "In Maryland, involuntary manslaughter is a common law felony, generally defined as an unintentional killing done without malice, in negligently doing some act lawful in itself or by the negligent omission to perform a legal duty." *See State v. Kanavy,* 416 Md. 1, 10, 4 A.3d 991, 996 (2010) (citations omitted); *State v. Albrecht,* 336 Md. 475, 499, 649 A.2d 336, 347 (1994); *see also State v. Pagotto,* 361 Md. 528, 548, 762 A.2d 97, 107–08 (2000) ("Involuntary manslaughter is a common law felony in Maryland. It is defined as an unintentional killing done without malice, (1) by doing some unlawful act endangering life but which does not amount to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty." (citation omitted)). Corbin does not explicitly challenge the sufficiency of the evidence on the

■ "The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State,* 415 Md. 174, 184, 999 A.2d 986, 991 (2010). As we explained, this standard applies when circumstantial evidence is the basis for a conviction:

> Circumstantial evidence is sufficient to sustain a conviction, but not if that evidence amounts only to strong suspicion or mere probability. Although circumstantial evidence alone is sufficient to sustain a conviction, the inferences made from circumstantial evidence must rest upon more than mere speculation or conjecture. (Citations and quotation marks omitted.)

*Id.* at 185, 999 A.2d at 992.

■ Corbin directs us to the physical evidence—semen from multiple men was found on the victim's clothing. Corbin thus argues that the victim had sex with multiple partners in an indeterminable order on the night she was killed. From there, he claims it is impossible to determine who was present when the victim was killed, which creates reasonable doubt of Corbin's guilt.

The State counters that the evidence was sufficient to support the conclusion that Corbin is guilty beyond a reasonable doubt. Corbin's semen was found in the victim's vagina and anus, but not on her clothing—according to the facts read into the record at the Circuit Court—and the State says this indicates the victim did not stand up after having sexual intercourse with Corbin. According to the State, the victim's failure to stand up after intercourse, combined with the. circumstances in which her body was found—partially naked in a field on a below-freezing night—demonstrates that Corbin inflicted the fatal blows.

---

common-law elements of the crime, but instead attacks the trial court's conclusion that he was present when the victim died.

Indeed, the following relevant facts were stipulated: the victim was found lying on her back; Corbin's semen was found in the victim's body, but none of it was found in her underwear; and semen from another man was found in the crotch area of her panties, which were found around the ankle of her right leg. From those facts, fair and rational inferences could be drawn that the panties had been moved from her waist area after another man had sex with her and before Corbin ejaculated; Corbin was the last one to have sex with her; the victim remained in a supine position after Corbin ejaculated; and thus Corbin was the one who killed her.

Tellingly, the record also indicates Corbin lied to the police twice about his sexual history with the victim before admitting he had sexual intercourse with her near the time she died. As the Court of Special Appeals described:

Among the undisputed facts are that Ms. Tilghman was seen alive at approximately 1:30 a.m. on the day she was killed, wearing the same clothes that were found with her body at 7:30 a.m. that day and that Corbin admitted having had sex with the victim as late as 3:00 a.m. on that day. Thus, Ms. Tilghman, after 1:30 a.m., would have to have changed clothes, encountered Corbin, engaged in consensual sex with him (presumably in a warm place), changed back into the same clothes she had worn earlier, gone out from that place, and encountered the murderer. Or, after 1:30 a.m., she would have to have encountered Corbin, engaged in sex with him (presumably in a warm place), put back on the same clothes she was wearing earlier, gone out from that place, and encountered the murderer. Under either scenario, the finder of fact, in order to conjure a reasonable hypothesis of innocence, would have to conclude that the actual murderer transported Ms. Tilghman from the place of their encounter [to where she was found] without a detectable and identifiable trace of Corbin's semen getting on her panties. Further, the fact finder would have to conclude that, once in the [field], the actual murderer beat the victim, took down her clothing, and strangled her, but never raped her, or raped her without leaving any semen

and without disturbing, from any orifice, the residuals of semen deposits made by Corbin at 3:00 a.m.

Viewing these facts in the light most favorable to the prosecution, in concert with the State's theory of the timing of the events on the night of the slaying, we believe a rational trier of fact could conclude that Corbin was present at the time of the victim's death. A rational trier of fact could further conclude that involuntary manslaughter was proved beyond a reasonable doubt. We therefore hold that sufficient evidence exists to sustain Corbin's conviction.

## Conclusion

For the reasons stated above, we affirm the Circuit Court for Somerset County's denial of Corbin's motion to suppress the DNA evidence from the straw. We also affirm the Court of Special Appeals' judgment that the evidence was legally sufficient to convict Corbin.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

BATTAGLIA, J., concurs.

BELL, C.J., and GREENE, J., dissent.

BATTAGLIA, J., concurring.

I write separately in concurrence because I agree that the collection of Corbin's DNA from the straw used to complete a court-ordered breath test was not a violation of the Fourth Amendment. I disagree with the majority opinion, however, not only because I adhere to the abandonment theory adopted by the Court in *Williamson v. State*, 413 Md. 521, 993 A.2d 626 (2010), but also because I believe that the majority inappropriately extends an already unfounded legal analysis expounded in *King v. State*, 425 Md. 550, 42 A.3d 549 (2012).

## I. Abandonment

In *Williamson v. State*, 413 Md. at 536–42, 993 A.2d at 635–38, Kelroy Williamson, who had been convicted of rape as well

as other charges, argued that DNA evidence recovered from a cup that he discarded after eating a meal, while being detained on charges related to an open arrest warrant, not the subject of the DNA analysis, should have been suppressed, because of an alleged privacy interest in the cup. We held that Williamson

> unequivocally abandoned the McDonald's cup after he had been offered a meal, accepted it, and then threw the debris from the meal on the floor. He certainly did not retain the cup as his own and clearly, while in the premises of the prison, could not reasonably expect that the police would not collect, and potentially investigate, the trash he discarded in his cell.

*Williamson,* 413 Md. at 536–37, 993 A.2d at 635. In holding that the motion to suppress the DNA evidence obtained was properly denied by the trial court, because Williamson had abandoned the cup, we relied on *Venner v. State,* 279 Md. 47, 367 A.2d 949 (1977), as well as *United States v. Cox,* 428 F.2d 683 (7th Cir.1970).

In *Venner,* Charles Venner, who had been convicted of drug charges, argued that the evidence obtained from seizing balloons containing hashish oil from his stools, deposited in a hospital bedpan, should have been suppressed because officers did not secure a search warrant. *Venner,* 279 Md. at 48–49, 367 A.2d at 950–51. We held that Venner's motion to suppress this evidence was properly denied because the stools were abandoned property and not subject to the protections of the Fourth Amendment.

In *Cox,* the Court of Appeals for the Seventh Circuit considered whether DNA evidence obtained from the warrantless seizure of hair clippings taken from a prisoner was subject to suppression. Cox was in State police custody as a suspect in a robbery when FBI agents arranged for prison officials to give Cox a routine haircut. After the haircut, the clippings were retained by the prison officials and DNA extracted from them was used as evidence. The Court of Appeals for the Seventh Circuit noted that "the 'seizure' did

not occur when the hair was cut, but when the government preserved and appropriated the clippings which the defendant had voluntarily abandoned." *Cox*, 428 F.2d at 687. Additionally, the Court of Appeals for the Seventh Circuit, akin to our analysis in *Venner*, stated that "Cox, however, never indicated any desire or intention to retain possession of the hair after it had been scissored from his head. Clippings such as those preserved in the instant case are ordinarily abandoned after being cut. Cox in fact left his hair and never claimed otherwise." *Id.*

Under *Williamson*, the threshold inquiry was whether the property upon which the DNA was deposited had been abandoned—whether the depositor had ever indicated any desire to retain the item within which the DNA was contained or upon which it was deposited. *See Stanberry v. State*, 343 Md. 720, 731, 737, 684 A.2d 823, 829, 831 (1996) ("Intent to abandon must ordinarily be assessed based on external manifestations such as the owners words and actions.").

Lest from the majority one think that abandonment does not have any contemporary "feet," I need only refer to *People v. Thomas*, 200 Cal.App.4th 338, 132 Cal.Rptr.3d 714 (2011), discussing facts remarkably similar to the case at bar, in which Thomas had been driving his car when police pulled him over for traffic violations and gave him an alcohol breath test. He passed the test and was allowed to leave, but police retained the plastic cap upon which he placed his mouth when taking the breath test. DNA was recovered from the straw linking Thomas to a rash of burglaries, for which he was convicted. In rejecting Thomas's argument that his DNA was collected in violation of the Fourth Amendment, the California intermediate appellate court held that Thomas "abandoned any expectation of privacy in the saliva he deposited on the device when he failed to wipe it off." *Id.* at 342, 132 Cal. Rptr.3d 714. The court reasoned that, because Thomas had implicitly consented to the alcohol testing under the California vehicle code as a result of his licensure, he could not contest the validity of the acquisition of his saliva, and, because he

abandoned his saliva, he could not contest its later testing for DNA.

Abandonment, thus, provides a viable analytical framework in this case, based on our jurisprudence and especially that of the Seventh Circuit in *Cox*, which addressed abandonment of *hair clippings* that were collected by authorities. Certainly, if the minutiae of hair clippings can be abandoned, so clearly can saliva on a straw be.

The majority, however, does not even mention, let alone distinguish, *Cox* and *Venner*, although relied upon by the State, nor attempts to explain why the rationale of abandonment is not viable. Rather, the majority simply states that, "[w]e do not subscribe to the notion that the Fourth Amendment is not applicable because Corbin *voluntarily* ceded a privacy interest in his saliva and the straw by failing to make an effort to 'gain possession' of the State-owned and State-administered testing apparatus."

This notion of voluntariness pervades Corbin's assertions but in the context of a situation in which he was forced to blow into the straw, thus involuntarily depositing his DNA. The issue is not whether he was forced to use a straw, but, rather, whether he abandoned the straw onto which he deposited his DNA, just as in *Cox*, 428 F.2d 683 (7th Cir.1970), in which Cox was required to submit to a haircut, but was found to have voluntarily abandoned his hair clippings, because "Cox ... never indicated any desire or intention to retain possession of the hair after it had been scissored from his head.... Having voluntarily abandoned his property, in this case his hair, Cox may not object to its appropriation by the Government." *Cox*, 428 F.2d at 687–88.

Whether or not Corbin earlier refused to provide a DNA sample also is not relevant to the analysis of abandonment of the straw, as the Massachusetts and New York Courts have recognized. In *Commonwealth v. Bly*, 448 Mass. 473, 862 N.E.2d 341 (2007), the Supreme Judicial Court of Massachusetts considered whether it was proper for a trial court to admit DNA evidence obtained from cigarettes and a water

bottle left behind by the defendant after a police interrogation. Bly had been incarcerated in the Massachusetts Correctional Institutional at Norfolk for an unrelated matter when police visited him to ask for a blood sample to use in a murder investigation. Bly refused to give a blood sample, but he smoked three cigarettes from a pack provided by police and drank from a water bottle they also had provided him. After the meeting between Bly and the police was over, detectives collected the cigarette butts and water bottle for DNA analysis. *Bly*, 862 N.E.2d at 349 n. 3. Bly sought to suppress the DNA match between his DNA left on the items at the jail and the DNA evidence, claiming his Fourth Amendment rights were violated. In affirming the denial of the motion to suppress the DNA evidence, the court held that Bly did not manifest a subjective expectation of privacy in DNA left on the discarded cigarette butts and water bottle, despite his earlier refusal to provide a DNA sample, because he made no effort to reclaim the items or take them with him after his interview with police. *Id.* at 356–57. Moreover, the court did not find compelling Bly's contention that because the institutional rules prevented him from leaving with items with which he did not arrive, he did not freely abandon his property. *Id.*

In *People v. Sterling*, 57 A.D.3d 1110, 869 N.Y.S.2d 288 (2008), the New York intermediate appellate court considered whether DNA evidence that was obtained from a milk carton left over from lunch was properly admitted against Sterling, who had been convicted on charges of rape, sodomy, and burglary. *Id.* at 289. Sterling was incarcerated in the Tioga County Jail for an unrelated offense when police arranged a meeting with him to ask for a DNA sample in connection with the crimes for which he was ultimately convicted. After he refused to give the sample, a correctional officer was ordered to retain whatever remained from Sterling's lunch tray for DNA analysis. Sterling unsuccessfully sought to suppress the DNA evidence obtained from the milk carton from his lunch, arguing that it was the product of an illegal search, but, as in *Bly*, the appellate court in *Sterling* did not accept Sterling's contention that his previous refusal to give a DNA sample was

sufficient to manifest an expectation of privacy in his DNA on the discarded milk carton.

Thus, unlike what the majority in this case rejects, abandonment is a basis for the retrieval of Corbin's DNA from the straw.

## II. King

The majority's reliance on *King v. State*, 425 Md. 550, 42 A.3d 549 (2012), also is misplaced and cannot be reconciled with the rationale utilized by the *King* majority. The muddle is partly a result of the confusion created by the majority opinion in *King*, which was decided subsequent to *Williamson* and which, *sub silentio*, eviscerates one of its underpinnings. The *Corbin* majority also further jumbles *King* by providing for DNA collection when DNA could not have been collected under the statute interpreted in *King*.

In *King*, the Court considered the validity, also under the Fourth Amendment, of additions, in 2008, to the Maryland DNA Collection Act, Section 2–501 *et. seq.* of the Public Safety Article, Maryland Code (2003, 2011 Repl.Vol.). Specifically at issue was Section 2–504(3), which provided for the collection of DNA samples for individuals who were arrested and charged, but not yet convicted,[1] of either a crime of violence or burglary, or an attempt thereof.[2]

---

**1.** Previously, in *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004), we upheld the validity of the DNA collection statute with respect to those convicted of a qualifying crime.

**2.** Section 2–504(3) provided:

(3) (i) In accordance with regulations adopted under this subtitle, a DNA sample shall be collected from an individual who is charged with:

    1. a crime of violence or an attempt to commit a crime of violence; or

    2. burglary or an attempt to commit burglary.

(ii) At the time of collection of the DNA sample under this paragraph, the individual from whom a sample is collected shall be given notice that the DNA record may be expunged and the DNA sample destroyed in accordance with § 2–511 of this subtitle.

King had been arrested for first and second degree assault. After he was transported to Central Booking following his arrest, King's DNA was collected pursuant to Section 2–504(3) of the DNA Collection Act, because he was arrested and charged with a crime of violence. After processing his DNA sample and uploading his DNA profile onto the Maryland DNA database, police received a hit that King's DNA matched evidence recovered from an unsolved rape. The rape happened approximately six years before King's DNA was collected and involved a man wearing a scarf over his face and a hat, armed with a handgun, breaking into a woman's home. The victim was unable to identify her assailant at the time the crime occurred, and police did not make any arrests.

After being notified of the match, police presented the evidence to a grand jury, which returned an indictment against King for numerous crimes, including first degree rape. The police also obtained a search warrant to collect a second DNA sample from King. In an effort to suppress the DNA samples collected from him, King argued that the DNA Collection Act was unconstitutional, such that his DNA was impermissibly collected after his arrest for assault and, "therefore King's arrest was invalid." *King v. State*, 425 Md. at 559, 42 A.3d at 554. The trial judge disagreed, relying on the principles in our opinion in *State v. Raines* to uphold the constitutionality of the DNA Collection Act as applied to arrestees, and King was ultimately convicted.

Before us, King argued that, because he was a mere arrestee and not a convict, he was "cloaked with the assumption of innocence until proven guilty," *id.* at 562, 42 A.3d at 556, such that the warrantless and suspicionless collection of his DNA

(iii) DNA evidence collected from a crime scene or collected as evidence of sexual assault at a hospital that a law enforcement investigator considers relevant to the identification or exoneration of a suspect shall be tested as soon as is reasonably possible following collection of the sample.

Section 2–504(3) of the Public Safety Article, Maryland Code (2003, 2011 Repl.Vol.) All subsequent references to the DNA Collection Act are to the Public Safety Article, Maryland Code (2003, 2011 Repl.Vol.), unless otherwise noted.

was a violation of the Fourth Amendment. The State countered that the DNA Act limits the use of lawfully acquired DNA to only identification, and that the government has a compelling interest in correctly identifying arrestees, while "arrestees have no expectation of privacy in their identity." *Id.* Ultimately, the *King* majority held the DNA collected from King should have been suppressed, because of its assessment that collecting King's DNA under the Act was an unconstitutional violation of his privacy rights under the Fourth Amendment.[3]

In reaching its holding suppressing the DNA results, the majority employed the totality of the circumstances test enunciated by the United States Supreme Court in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Under that test, a court must evaluate the reasonableness of a warrantless search or seizure "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *King*, 425 Md. at 563, 42 A.3d at 557, quoting *Knights*, 534 U.S. at 118–119, 122 S.Ct. at 591, 151 L.Ed.2d at 505 (2001).

The *King* majority opined that King had "an expectation of privacy to be free from warrantless searches of his biological material and all of the information contained within that material." *King*, 425 Md. at 595, 42 A.3d at 576. The Court directly rejected the analogy between fingerprints and DNA, an analogy we explicitly sanctioned two years before in *Williamson v. State*, 413 Md. 521, 542, 993 A.2d 626, 639 (2010), juxtaposing the theories that, "[t]he information derived from

---

**3.** Although the majority expressed skepticism that the statute could survive constitutional muster facially, it only declared the Act unconstitutional as applied to King, reasoning that "there are conceivable, albeit somewhat unlikely, scenarios where an arrestee may have altered his or her fingerprints or facial features (making difficult or doubtful identification through comparison to earlier fingerprints or photographs on record) and the State may secure the use of DNA samples, without a warrant under the Act, as a means to identify an arrestee, but not for investigatory purposes, in any event." *King v. State*, 425 Md. 550, 601, 42 A.3d 549, 580 (2012).

a fingerprint is related only to physical characteristics and can be used to identify a person, but no more," while a "DNA sample, obtained through a buccal swab, contains within it unarguably much more than a person's identity." *King,* 425 Md. at 595–96, 42 A.3d at 576–77. The majority was unable to "turn a blind eye to the vast genetic treasure map that remains in the DNA sample retained by the State." *Id.* at 596, 42 A.3d at 577. Balanced against this vast "treasure map" of genetic markers, as yet undiscovered and undocumented, the government's interests in including and excluding perpetrators of serious crimes fell short.

This vast treasure trove analysis remains, however, the stuff of conjecture, because, as we recognized in *Williamson v. State,* 413 Md. 521, 993 A.2d 626 (2010), the DNA Collection Act limits the use of DNA collected to identification only, both to include and exclude suspects, such that the use of DNA profiles is "akin to that of a fingerprint." *Id.* at 542, 993 A.2d at 639. Importantly, in *Williamson,* we recognized that the argument that a DNA sample under the Act could be used for much more than identification as nothing more than a "parade of horribles" that had not been shown to have occurred, stating that "[w]hile there may be debate regarding privacy concerns should technological advances permit testing of DNA to glean more information from acquired DNA than mere identification, that debate does not have 'feet' in the present case." *Williamson,* 413 Md. at 543, 993 A.2d at 639. The debate did not have any more foundation in *King,* decided two years later.

The *King* holding, as it eviscerated *Williamson,* is now itself undercut by the majority in this case, because, under Section 2–504(a)(1) of the DNA Collection Act, DNA can be collected only from people convicted of "a felony or a violation of [Section] 6–205 or [Section] 6–206 of the Criminal Law Article," penalizing burglary in the fourth degree and the possession of burglar's tools with the intent to break into a motor vehicle, as well as being present in a motor vehicle with the intent to commit a theft of the vehicle or property therein, respectively. Thus, unless an individual is convicted of one of

those offenses or consents,[4] absent a warrant, DNA cannot be collected. In the present case, Corbin was convicted of driving under the influence, a misdemeanor,[5] which is *not* among the offenses for which one is convicted, where DNA collection is authorized under the Act.

As a result of the present case interpreting the Fourth Amendment, a probationer convicted of a crime for which DNA could not be collected under the DNA Collection Act, will have his DNA collected without his consent and without a warrant, although our Legislature clearly did not provide for such in the Act. Although the instant majority would have the distinction hinge on the fact that the present case does not involve statutory interpretation, as in *King*, both this case and *King* involve a Fourth Amendment analysis. Reconciliation can only be that those on probation, even for petty offenses, have no expectation of privacy in the "treasure trove" of their genetics, while arrestees for felonies, even with serious records, do in their identification. Conversely, then the State, according to the majority, has a greater interest in collecting DNA from someone convicted of driving under the influence than it does in collecting DNA from an individual arrested on probable cause for a crime of violence. The equation is all wrong.

Because I believe Corbin abandoned the straw, I would affirm his conviction.

GREENE, J., dissenting, in which BELL, C.J., joins.

Initially, police officers investigating the death of Jacqueline Tilghman, in 1995, were unable to identify the source of the DNA found in and on her body. Through their investigation, however, the lead investigator, Sergeant Jack McCauley of the

---

4. As the majority notes, there is no record evidence that Corbin consented to the collection of DNA either orally or in his probation order.

5. The record does not reflect the exact offense for which Corbin was convicted, but, as the majority notes, there is nothing to indicate that Corbin was convicted of a felony. *Corbin v. State*, 428 Md. 488, 508–09, 52 A.3d 946, 957–58, 2012 WL 3588705 (2012).

Maryland State Police Cold Case Homicide Unit, "developed a list of [13] male associates of Ms. Tilghman" and sought to obtain samples of their DNA. Tonto Corbin was included in that list; however, he refused to voluntarily furnish a sample of his DNA. Through further investigation, the police learned that Corbin was on probation for a DWI offense and was required "to submit to breath tests for alcohol consumption[.]" Sgt. McCauley arranged for Corbin's probation officer to administer to Corbin a "deep lung test" in March 2001. This test, unlike the passive breath test that is ordinarily administered to probationers, requires the person taking the test to use a straw to give a breath sample. The person taking the test places his or her "lips around the end of the straw and [is asked to] exhale[ ] as deep a breath as possible from the lung capacity." At the investigator's request, the probation officer prearranged, without Corbin's knowledge or consent, to "retain custody of the straw so that the saliva on it could be tested for DNA."

Corbin's DNA from the straw was collected and tested and determined to be a match to that found on swabs taken from the victim. On the basis of this information, the police obtained a search warrant for another DNA sample from Corbin. After losing on his motion to suppress the DNA evidence collected and tested, Corbin proceeded to trial in the Circuit Court for Somerset County, on an agreed statement of facts. The trial judge found Corbin guilty of involuntary manslaughter in the death of Ms. Tilghman and sentenced him to ten years' incarceration, with all but eight years suspended, and two years of supervised probation. Following the appeal of his conviction to the Court of Special Appeals, Corbin requested *certiorari* in this Court, and we granted his petition. In this Court, as in the proceedings in the Circuit Court and in the Court of Special Appeals, Corbin maintains that his Constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment has been violated. Specifically, in this Court, Corbin asserts that the Court of Special Appeals erred in concluding that he had no reasonable expectation of privacy in the breath test straw or in the saliva

thereon. In addition, he argues that this Court should "reject the seriously flawed analogy between a DNA profile and a fingerprint" that was drawn by this Court in *Williamson v. State,* 413 Md. 521, 993 A.2d 626 (2010).

Primarily for the reasons expressed in Chief Judge Bell's well-written and comprehensive dissenting opinion in *Williamson*—namely, the principle that DNA testing and analysis is a separate search subject to Fourth Amendment scrutiny—I would reverse Corbin's conviction and remand the case to the Circuit Court for Somerset County for a new trial. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. The United States Supreme Court has explained that "the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights,* 534 U.S. 112, 118–19, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 505 (2001) (internal quotation omitted). Even though the breathalyzer test administered to Corbin was reasonable, the DNA testing and analysis performed on Corbin's saliva, left on the straw, was a separate search that also needed to satisfy the requirements of the Fourth Amendment. Thus, so long as Corbin possessed a reasonable expectation of privacy in his DNA, the DNA evidence gathered, analyzed, and used for investigative purposes, without a warrant and without Corbin's consent, was obtained in violation of his Constitutional rights.

It is well settled that probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709, 718 (1987) (internal quotation omitted). Courts have also recognized, however, that a probationer's expectation of privacy is not extinguished by his probationary status. *See Griffin,* 483 U.S.

at 875, 107 S.Ct. at 3169, 97 L.Ed.2d at 718 (noting that probationary status "permit[s] a degree of impingement upon privacy that would not be constitutional if applied to the public at large. That permissible degree is not unlimited, however . . ."); *United States v. Amerson*, 483 F.3d 73, 84 (2d Cir.2007) (declaring that "[p]robationers . . . have diminished—but far from extinguished—reasonable expectations of privacy"). Instead, probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin*, 483 U.S. at 874, 107 S.Ct. at 3169, 97 L.Ed.2d at 718.

In the present case, Corbin's status as a probationer, coupled with the condition that he submit to periodic alcohol testing, clearly diminished his expectation of privacy; however, his probationary status and his conditions of probation did not eliminate his reasonable expectation of privacy in his own DNA. *See Knights*, 534 U.S. at 119–20, 120 n. 6, 122 S.Ct. at 591–92, 592 n. 6, 151 L.Ed.2d at 505–06, 505 n. 6. Rather, not unlike the petitioner in *Williamson*, Corbin possessed a reasonable expectation of privacy in the information contained in his DNA, which triggered Fourth Amendment protection. Therefore, the detectives investigating the murder were required to comply with the requirements of the Fourth Amendment before gathering and analyzing Corbin's DNA.

Importantly, in my view, a probationer's diminished expectation of privacy is not limitless in its scope. *See State v. Raines*, 383 Md. 1, 65, 857 A.2d 19, 57–58 (2004) (Bell, C.J., dissenting) (expressing concern that there were no limitations placed on the respondent's diminished expectation of privacy as a result of his status as a convicted felon). I disagree with the majority's assertion that a search performed while an individual is on probation need not relate to the conditions of probation or the underlying offense(s). *See Corbin v. State*, 428 Md. 488, 501–02, 52 A.3d 946, 954, 2012 WL 3588705 (2012). The majority discusses the various problems associated with the serious offense of drunken driving. *See Corbin*, 428 Md. at 509–10, 52 A.3d at 958. Accordingly, the conditions

of probation imposed upon an individual convicted of an alcohol-related offense, and police action in connection therewith, should be aimed at decreasing or deterring problems associated with the underlying offense. The breathalyzer testing that Corbin agreed to submit to periodically was reasonably related to the offense for which he was convicted and placed on probation. DNA testing and analysis of saliva left on an alcohol monitoring instrument, to be used in connection with an unrelated homicide investigation, however, has no relation to decreasing or deterring the occurrence of alcohol-related offenses.

In general, restrictions placed on a probationer during the probation period "are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Griffin*, 483 U.S. at 875, 107 S.Ct. at 3169, 97 L.Ed.2d at 718; *see Knights*, 534 U.S. at 119, 122 S.Ct. at 591, 151 L.Ed.2d at 505 (noting that "the two primary goals of probation [are] rehabilitation and protecting society from future criminal violations"). In addition, the State has an interest in "reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees[.]" *Samson v. California*, 547 U.S. 843, 853, 126 S.Ct. 2193, 2200, 165 L.Ed.2d 250, 260 (2006). DNA testing of Corbin's saliva, obtained from the instrument used to conduct the deep lung breath test, did not directly serve any of the enumerated purposes of probation. Reducing recidivism rates is geared toward combating the occurrence of future, not past, crimes. The murder allegedly committed by Corbin had occurred years prior to his conviction for the DWI offense; the collection and testing of Corbin's DNA, obtained to aid in finding and convicting the perpetrator of the murder, therefore, had nothing to do with deterring Corbin from re-offending. In addition, to the extent that the periodic breath tests were aimed at rehabilitating Corbin or protecting society from the possibility of Corbin committing DWI offenses in the future, DNA testing of Corbin's saliva in relation to an ongoing murder investigation did not serve those purposes. There-

fore, if Corbin had a diminished expectation of privacy, stemming from his probationary status, that diminished expectation should not have extended to searches that had no relation to the underlying crime, to the conditions of probation, or to the purposes of probation in general.

The majority employs a totality of the circumstances analysis in determining whether the officers' actions violated the unreasonable search prohibition of the Fourth Amendment. *Corbin,* 428 Md. at 502–03, 52 A.3d at 954–55. Relying on *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the majority concludes that the search was reasonable, in light of Corbin's diminished expectation of privacy as a probationer. *Corbin,* 428 Md. at 510, 52 A.3d at 958. I agree with the majority that the breathalyzer test was reasonable, considering Corbin's probation status and the inclusion of alcohol monitoring in his probation order, which Corbin apparently agreed to comply with as a condition of probation. The subsequent DNA testing and analysis performed on Corbin's saliva, however, was a separate and distinct search, and the record does not support the conclusion that Corbin consented to or agreed to the search as one of the conditions of his probation. Therefore, the case *sub judice* is distinguishable from the facts and analysis in *Knights.*

In that case, Knights was on probation for a drug offense. *Knights,* 534 U.S. at 114, 122 S.Ct. at 589, 151 L.Ed.2d at 502. His probation order included the following condition: "that Knights would '[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.' " *Id.* Knights signed the probation order, indicating he had read and understood its terms. *Id.* During the period of Knights's probation, police conducted a warrantless search of his home that produced contraband. *Knights,* 534 U.S. at 115, 122 S.Ct. at 589, 151 L.Ed.2d at 503. Knights moved to suppress the evidence at trial, and the trial judge granted the motion on the ground that the search was for investigatory, rather than

probationary, purposes. *Knights,* 534 U.S. at 116, 122 S.Ct. at 590, 151 L.Ed.2d at 503.

On review, the Supreme Court addressed whether the search had violated Knights's Fourth Amendment rights. *Knights,* 534 U.S. at 116, 122 S.Ct. at 590, 151 L.Ed.2d at 503. The Supreme Court examined the reasonableness of the search at issue by conducting a totality of the circumstances analysis. *Knights,* 534 U.S. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 505. Highlighting the conditions present in the probation order and the fact that Knights was unambiguously informed of them, the Supreme Court stated that "[t]he probation condition thus significantly diminished Knights' [s] reasonable expectation of privacy." *Knights,* 534 U.S. at 119–20, 122 S.Ct. at 591–92, 151 L.Ed.2d at 505. The Supreme Court balanced Knights's diminished expectation of privacy against the State's interests and concluded, "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Knights,* 534 U.S. at 121, 122 S.Ct. at 592–93, 151 L.Ed.2d at 506–07.

In *Samson v. California,* 547 U.S. 843, 847, 126 S.Ct. 2193, 2196, 165 L.Ed.2d 250, 256 (2006), the United States Supreme Court relied on its opinion in *Knights* in confronting the issue of "whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." In reviewing its analysis in *Knights,* the Supreme Court commented that it had found Knights's probation status and the conditions set out in the probation order, as well as the fact that Knights was unambiguously aware of the conditions, important factors in its totality of the circumstances analysis. *Samson,* 547 U.S. at 848–49, 126 S.Ct. at 2197, 165 L.Ed.2d at 257. The Supreme Court emphasized in *Samson* that "the search at issue in *Knights* was predicated on *both* the probation search condition *and*

reasonable suspicion[.]" *Samson,* 547 U.S. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258 (emphasis added).

Unlike the respondent in *Knights,* the challenged search in the instant case was not included as a condition in Corbin's probation order.[1]  While alcohol monitoring, in the form of periodic breath tests, was listed as a condition of probation, to which Corbin apparently agreed, the record does not support the conclusion that the DNA testing and analysis stemming from the breath tests were included in the order.  The Supreme Court made clear in *Knights,* and later affirmed in *Samson,* that Knights's expectation of privacy was diminished by his status as a probationer *as well as* the specific probation condition that informed him of the warrantless searches to which he could be subjected.  The Supreme Court considered the probation search condition a "salient circumstance." *Knights,* 534 U.S. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 505. Corbin was never made aware of, nor did he agree to, a diminished expectation of privacy with regard to the personal information contained in his DNA. Corbin's agreement to submit to periodic alcohol testing did not logically include consent to test any DNA material that may have been left on the breath test instrument.  The absence of a probation condition relating to the search of Corbin's DNA that was performed distinguishes the facts of the instant case from those in *Knights.*

Furthermore, as the majority notes, the defendants in *Knights* and *Samson* were on probation for felony offenses; in contrast, Corbin's probation stemmed from his conviction for a misdemeanor.  *Corbin,* 428 Md. at 508–09, 52 A.3d at 957–58. The majority attempts to distinguish Corbin's DWI conviction from other misdemeanors by stating that "this misdemeanor

---

1.  While the probation order itself was not included in the record of the case at bar, neither party has contended, in this Court, that analysis of Corbin's DNA or entry of his DNA profile into CODIS was part of the probation order.  Therefore, I proceed on the assumption that DNA testing and analysis was not a condition of probation.  In addition, as noted by the majority, the DNA testing and analysis performed on Corbin's saliva was not covered by the DNA Collection Act.

offense, unlike many misdemeanors, carries the potential for significant jail time." *Corbin,* 428 Md. at 509, 52 A.3d at 958. In addition, according to the majority, drunken driving is a serious offense with a high recidivism rate. *Corbin,* 428 Md. at 509, 52 A.3d at 958. Therefore, in the majority's view, "a person on probation from a drunken driving offense has, like the probationer in *Knights,* a significantly diminished expectation of privacy." *Corbin,* 428 Md. at 510, 52 A.3d at 958. The majority, however, gives no clear, principled reason for distinguishing DWI convictions from all other "lesser misdemeanor[s.]" *See Corbin,* 428 Md. at 510 n. 11, 52 A.3d at 958 n. 11. Surely, the fact that the defendants in *Knights* and *Samson* were convicted of felony offenses influenced the Supreme Court's determination with regard to their respective diminished expectations of privacy. Corbin does not, as a result of his misdemeanor DWI conviction, pose a similar threat to society. To the extent that there was a concern that Corbin would commit another alcohol-related offense, the mandatory alcohol monitoring included in Corbin's probation order was sufficient to alleviate that concern. To extend a diminished expectation of privacy to every aspect of Corbin's life, specifically his privacy interest in the information contained in his DNA, was not reasonable in light of his probation status for a misdemeanor offense and the subsequent use of incriminating evidence in a completely unrelated homicide investigation.[2]

---

2. Similarly, in her analysis, Judge Battaglia highlights the flaws in the majority's reasoning on this point. This Court recently issued an opinion in *King v. State,* 425 Md. 550, 597–98, 42 A.3d 549, 578 (2012), wherein we held that it was a violation of King's Fourth Amendment rights to collect his DNA without a warrant, pursuant to the DNA Collection Act, following his arrest for an offense enumerated under the Act. In the instant case, Judge Battaglia explains the absurd result reached by the majority's analysis, when read in conjunction with the rationale and holding in *King:* "[T]hose on probation, even for petty offenses, have no expectation of privacy in the 'treasure trove' of their genetics, while arrestees for felonies, even with serious records, do in their identification." *Corbin,* 428 Md. at 525, 52 A.3d at 967 (Battaglia, J., concurring). I agree that, in light of this Court's opinions addressing Fourth Amendment protection in the context of DNA collection and analysis, such an outcome is illogical.

I also disagree with the notion, espoused by a majority of this Court, that DNA profiling is analogous to fingerprinting. As explained in Chief Judge Bell's dissent in *Williamson,* "[a] fingerprint is an impression left by the depositing of oil upon contact between a surface and the friction ridges of fingers." *Williamson,* 413 Md. at 551 n. 3, 993 A.2d at 644 n. 3 (Bell, C.J., dissenting) (internal quotation omitted). The collection of a person's DNA, however, "requires production of evidence below the body surface which is not subject to public view[.]" *United States v. Mitchell,* 652 F.3d 387, 425 (3d Cir.2011) (Rendell, J., dissenting) (quotation omitted). DNA analysis is more technologically sophisticated than fingerprint analysis in that the DNA is broken down and analyzed "to create a DNA record, a profile, capable of, and for, comparison with other profiles." *Williamson,* 413 Md. at 562, 993 A.2d at 650 (Bell, C.J., dissenting). Therefore, the nonconsensual testing and analysis of substances that may be used for DNA profiling are subject to scrutiny under the Fourth Amendment. *See Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 659 (1989); *Schmerber v. California,* 384 U.S. 757, 766–72, 86 S.Ct. 1826, 1833–36, 16 L.Ed.2d 908, 917–20 (1966); *Williamson,* 413 Md. at 562–64, 993 A.2d at 651–52 (Bell, C.J., dissenting).

Although the taking of a DNA sample may not be unreasonably invasive, it is substantially intrusive in that the "samples the Government seeks to extract contain far more than the mere identifying information that can be gleaned from a suspect's fingerprints ...." *Mitchell,* 652 F.3d at 425 (Rendell, J., dissenting); *Raines,* 383 Md. at 73, 857 A.2d at 62 (concluding that "[a]lthough the intrusion of a buccal swab may be minimal in a physical sense, it certainly is great when the vast amount of personal and private information DNA contains is considered" (Bell, C.J., dissenting)); *State v. Martin,* 184 Vt. 23, 955 A.2d 1144, 1168–69 (2008) (noting that "DNA profiling involves a significantly greater intrusion of privacy than fingerprinting" because DNA samples must be analyzed and in the process "intimate details of one's genetic make-up are revealed ..." (Johnson, J., dissenting)). Cer-

tainly, Corbin had a reasonable expectation of privacy in this sensitive information.

With regard to breath tests specifically, the Supreme Court has stated, "Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis implicates ... concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber*, should ... be deemed a search." *Skinner*, 489 U.S. at 616–17, 109 S.Ct. at 1413, 103 L.Ed.2d at 659 (citations omitted). Thus, although the deep lung test itself may not have been an invasive method of obtaining Corbin's DNA, the information gleaned as a result of testing and analyzing the sensitive and private information contained in the DNA was certainly an invasion of Corbin's privacy. The Supreme Court noted in *Skinner* that "breath tests reveal the level of alcohol in [an individual's] bloodstream and nothing more." *Skinner*, 489 U.S. at 625, 109 S.Ct. at 1418, 103 L.Ed.2d at 665. When, however, saliva left on a breath test instrument is subjected to DNA testing, as in the instant case, the nature and extent of the information revealed drastically changes. Thus, the search performed on Corbin's DNA revealed different, and substantially more, information than Corbin could have expected based on the conditions of probation and the deep lung test he agreed to take.

The purpose of the warrant requirement is "to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621–22, 109 S.Ct. at 1415–16, 103 L.Ed.2d at 663. Furthermore, "[a] warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." *Skinner*, 489 U.S. at 622, 109 S.Ct. at 1416, 103 L.Ed.2d at 663 (citations omitted). As the Supreme Court stated in *Schmerber*, "[t]he importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Schmerber*, 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919. Sensitive information contained in genetic material

should be subject to the warrant requirement. DNA testing and analysis, particularly the analysis performed on Corbin's DNA in the case at bar, are clearly used for investigatory purposes to be presented as evidence against the accused at trial. *See Raines,* 383 Md. at 50–51, 857 A.2d at 49 (opining that "[i]t is true, of course, that the DNA sample [collected] will be used to establish identity, but the principal purpose of establishing identity will be to provide evidence of criminality, evidence that will allow the police to establish probable cause to collect precisely the same evidence for use in court" (Wilner, J., concurring)).

The Supreme Court in *Griffin* posited that, in a situation involving a search of a probationer, "the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct, and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." *Griffin,* 483 U.S. at 876, 107 S.Ct. at 3170, 97 L.Ed.2d at 719 (internal citations omitted). That rationale is not applicable to the circumstances surrounding collection and analysis of Corbin's DNA. The crime for which Corbin's DNA was obtained, for comparison purposes, was committed years prior to police efforts to obtain a DNA sample. Police had the ability, subject to the requirements of the Fourth Amendment, to gather this evidence at any time. There was no danger, as eluded to in *Griffin,* of Corbin destroying the evidence sought by police in connection with the murder. Similarly, there was no apparent need for police to act expeditiously, necessitating avoidance of the warrant requirement. The detectives investigating the case were capable of, and in fact required to, submit a statement of probable cause to a neutral and detached magistrate and obtain a search warrant for Corbin's DNA. In addition, Corbin's DNA was not subject to a search as one of the conditions of his probation. Thus, the police acted without any authorization to collect and analyze Corbin's DNA. Moreover, the police conducted the search without any individualized suspicion that Corbin was involved in criminal activity occurring while he was on probation. *See Raines,* 383 Md. at 74, 857

A.2d at 63 (concluding that the search at issue violated the prisoner's Fourth Amendment rights because "the State [did] not sufficiently establish[ ] that there [was] any individualized basis for the search, probable cause or some appropriate level of suspicion, that would justify any intrusion upon the [prisoner's] constitutionally-protected privacy interest in his own body" (Bell, C.J., dissenting)).

The DNA evidence collected, analyzed, and used for investigative purposes, with regard to Corbin, constituted a search subject to Fourth Amendment scrutiny. Therefore, as a result of the search, the burden rested with the State to establish that a recognized exception to the warrant requirement applied in order to justify the intrusion. Having failed to establish an exception to the warrant requirement, the DNA evidence and the results flowing from the comparisons of that evidence should have been suppressed. Accordingly, I respectfully dissent.

Chief Judge Bell has authorized me to state that he joins in this dissenting opinion.